(No. 31814.—)

IN RE WILLIAM GOLDSTEIN, Attorney, Respondent.

*Opinion filed January 24, 1952—Rehearing denied March 17, 1952.*

SCHAEFER, J., dissenting.

CHARLES LEVITON, of Chicago, *amicus curiae.*

ALEXANDER WOLF, and LOUIS C. RAPPAPORT, both of Chicago, (ODE L. RANKIN, of counsel,) for respondent.

Mr. JUSTICE FULTON delivered the opinion of the court:

On May 15, 1947, the Committee on Inquiry of the Chicago Bar Association, acting as commissioners under Rule 59 of this court, filed a complaint against the respondent, William Goldstein, an attorney, charging him with being guilty of conduct and practices which tend to bring the legal profession into disrepute. Respondent filed an answer denying all the material charges.

The record in the case is voluminous, consisting of nearly 4000 pages. In the complaint the primary charge

was that respondent had testified and sworn falsely on the trial of William R. Johnson in the Federal court and in his testimony before the commissioners. Further, the complaint charged that respondent conspired with one Skidmore and others to defraud the United States of income taxes.

The history of the case revolves around the association of respondent with two friends and clients, William Skidmore and William R. Johnson. Skidmore and Johnson were gamblers on a tremendously large scale in the city of Chicago and surrounding area, for many years just prior to 1940. They were patrons, owners or managers of numerous gambling houses or enterprises, which, during the years from 1936 to 1939, returned to them fabulous sums by way of income. On their tax returns to the United States Government during that period they reported annual incomes ranging from $100,000 to $250,000.

William Johnson was indicted in the Federal district court in 1940 charged with evasion of income taxes for the years above specified and for conspiracy to defraud the United States of income taxes. On the trial before a jury, Johnson was found guilty and, after successive appeals to the United States Circuit Court of Appeals and the United States Supreme Court, the judgment of the district court was affirmed. Johnson was sentenced to a five-year term in the Federal penitentiary, in addition to heavy fines. Thereafter he served his term and was released.

Skidmore was indicted in 1940, tried and found guilty on a similar indictment in the United States district court. He also was fined and sentenced to the Federal penitentiary where he died in 1944 while serving his sentence.

Respondent and several other individuals were named as defendants in the Johnson indictment, but as to the respondent the charge was nolle prossed. He had been a close friend with Skidmore since about 1923, and with Johnson for more than ten years. As an indication of the

intimate relationship existing between Johnson, Skidmore, and respondent, the latter testified that during 1936, 1937, 1938, and 1939, he saw Johnson and Skidmore at least twice a week at the Morrison hotel, where Johnson and Skidmore met for personal conferences in which respondent took no part; that on those occasions they would meet in the lobby and from there go to various restaurants and hotels such as the Morrison, the Blackstone, the Empire Room, and other famous eating places; that they would spend the evening, have dinner, watch the show, might go out for a ride, and then Johnson would take respondent home.

In the complaint filed by the commissioners, it was specifically charged, among other things, that the respondent testified falsely on the trial of William R. Johnson, in the Federal court, with reference to the purchase of various properties, wherein he swore that the purchase price of such properties, aggregating some $365,000, had been delivered to him in currency by Johnson. The properties were generally designated as The Dells; the property at Ninety-seventh Street and Western Avenue, Chicago; The Albany Park Building; the Bon Air Country Club; the "White House"; the "Green House," and the Curran farm. The implication was that Johnson was the sole owner of the properties. On the trial Johnson denied almost *in toto* the testimony of respondent with respect to the purchase of said properties. In his answer the respondent admitted the giving of such testimony but asserted its truth.

The Johnson case had a long history in the Federal courts, and receives extensive comment in the briefs of both the *amicus curiae* and the respondent. After conviction and sentence, a motion for new trial was overruled. On appeal to the Federal Circuit Court of Appeals, the judgment of the United States district court was reversed. On *certiorari* in the United States Supreme Court, an

opinion was filed reversing the Circuit Court of Appeals. (319 U.S. 503.) Shortly after, Johnson moved for a stay of the mandate and to have the cause remanded to the Circuit Court of Appeals for the purpose of entertaining a motion for new trial on the ground of newly discovered evidence. The motion for new trial was transferred to the Circuit Court of Appeals for disposition and by it remanded to the United States district court for the purpose of taking jurisdiction. Johnson's motion was based on the claim that respondent, Goldstein, had, on the trial of Johnson, wilfully testified falsely as to material matters, and filed affidavits in support of the motion. The motion was heard by Judge Barnes and denied with a long and detailed memorandum opinion. Further appeal was taken to the Circuit Court of Appeals, there was another application for *certiorari* in the United States Supreme Court, as well as the disposition of a third motion for new trial, but the net result was the denial of the motions for a new trial.

To discuss the opinions of the Federal courts in detail on the various appeals and to examine and report the evidence submitted on the purchase of all of the above properties would prolong and extend this opinion to an interminable length. Much has been said about the remarks of Judge Barnes in denying the amended motion for a new trial in the Johnson case. After a most thorough review of that case, including new affidavits filed in support of the motion, the court, in the course of his remarks, stated the following: "The court does not believe that Goldstein has recanted, does not believe that he perjured himself on the trial and, on the contrary, believes that he was quite circumspect," and finally concluded that the motion for new trial on the ground of newly discovered evidence should be denied.

On the review of the order denying the motion for new trial on the grounds of newly discovered evidence in

the Circuit Court of Appeals, Judge Minton, in affirming the United States district court, stated the following: "We cannot say, in the light of the whole record before the District Court, that the so-called newly discovered evidence leads to the conclusion that Goldstein had testified falsely."

It might be noted that in an appeal from a subsequent order denying a third motion for new trial on the same grounds, the Circuit Court of Appeals, in an opinion by Judge Major after an analysis of the testimony, stated: "As our opinion discloses, we have reached the conclusion that Goldstein testified falsely at the trial. The conviction which we entertain in this respect is without reservation." The judgment of the district court was, by the same opinion, affirmed. Application by the Government for *certiorari* was granted. The United States Supreme Court reversed the Circuit Court of Appeals on the ground the court, upon determining that the only objection was to the trial court's findings on conflicting evidence, should have decided that this does not present a reviewable issue of law. The cause was remanded to the United States district court for the purpose of enforcing the judgment.

It is the contention of respondent that while the decisions or opinions of the courts in cases where respondent was not a party are not *res judicata* in this proceeding, they should be given full faith and credit, and, by comity, be deemed conclusive.

We do not consider it the province of this court, in a disbarment proceeding, to review, commend, criticize or change any decision of courts of competent jurisdiction, much less opinions of the United States courts, all concerning applications for a new trial. If this proceeding were based entirely upon the records made in those courts in the Johnson trial, there would be little for this court to decide.

However, the testimony presented to the commissioners unfolds new testimony and new questions for determina-

tion. Many new witnesses and much additional evidence were introduced for their consideration.

In the purchase of all the real-estate properties above named, respondent throughout testified that he received all the purchase price in currency from Johnson. With reference to the purchase of "The Dells," it was shown on the hearing before the commissioners, through cross-examination and outside witnesses, that he knew very well Skidmore owned a one-half interest; that he told one Huscher, former owner of "The Dells" that he represented Skidmore in the purchase; that he, Huscher, had met Skidmore on the property during the sale negotiations and that Skidmore exercised ownership of the property immediately after the sale. Confirmation of this testimony was given by Eli Herman, attorney for the owner, and other witnesses. On cross-examination before the commissioners, respondent testified that Skidmore had no interest in "The Dells" to his knowledge, and that he did not know of any personal transactions between Skidmore and Johnson.

The record discloses a similar situation with reference to the purchase of the "Bon Air Country Club." Respondent's testimony showed that he handled the negotiations for the purchase of the property and, when the price of $75,000 was agreed upon, he received the purchase price in currency from Johnson in two sums; that title was taken in the name of respondent's son, Ted Goldstein, and subsequently there was a quitclaim deed delivered to Johnson. Before the commissioners, respondent testified that "Skidmore did not have an interest in Bon Air to my knowledge." In opposition to this statement, the record shows numerous witnesses testifying to facts indicating that respondent was particularly intimate with the fact that Skidmore was a part owner and actively interested in the purchase, the improvement and the organization of the Bon Air Country Club under the new management. Frank H. Just, publisher of the *Waukegan News-Sun,* a daily newspaper, testified

that respondent told him in 1938 that he represented Skidmore and that "they were going to open Bon Air Country Club as a de luxe gambling place." There is other substantial testimony in the record disclosing respondent's knowledge of Skidmore's interest in the club and respondent's co-operation with him.

The evidence concerning the purchase of the other properties named is similar in character, with respondent in conflict with other witnesses as to facts and details.

Our references to the testimony are necessarily sketchy because of the great volume, but we cannot help but feel that respondent, for reasons of his own, has shown a strong inclination to protect Skidmore and to cast the burden on Johnson.

At the close of the hearing the commissioners found that the conduct of the respondent was unprofessional, unethical, dishonorable, denoting lack of good moral character and tending to bring the profession and courts into disrepute and contempt, and that respondent should be disbarred.

Respondent has had excellent representation, through eminent counsel, but they rely heavily on the opinions of the Federal courts in passing upon motions for a new trial in the Johnson case because of alleged false testimony on the part of respondent. "A disbarment proceeding is not a criminal case with its formalities of pleading, but is an investigation of an attorney's conduct to determine whether he should be disbarred or otherwise disciplined." (*In re Hamilton,* 388 Ill. 589.) To constitute cause for disbarment or discipline, the conduct of an attorney need not necessarily amount to a crime or misdemeanor. *In re Alschuler,* 388 Ill. 492.

This court is not attempting to try the respondent for perjury nor to go behind the records made in the Federal courts in the Johnson trial. Nor do we believe there is clear and positive proof that respondent conspired with

Skidmore and Johnson for the purpose of defrauding the United States Government of income taxes. However, we do feel that respondent has so colored his testimony and has substantially aided Skidmore and Johnson in the establishment of gambling institutions to such an extent that he has deviated and departed from the standard of honesty and integrity required of the bar. Expressions of derision and distrust of lawyers are too prevalent to be disregarded by the members of the legal profession, and it is only through the action of the organized bar that the high standard lawyers are entitled to can be maintained. Respondent bears a fine family and professional record. He was admitted to the bar in 1915 and has practiced continuously in the city of Chicago since admission. He is married and the father of three children; one, a son, was killed in action in World War II in 1945. Another son is a member of the Illinois Bar and also served in World War II. Distinguished members of both the bench and the bar testified that respondent's reputation for truth and veracity and as a law-abiding citizen was good.

In accord with the rule of this court in the past that the power to discipline an attorney should be administered with moderation, and on account of the previous good standing of respondent as a member of the bar, we are not inclined to strike his name from the roll of attorneys.

Respondent is suspended from the practice of law in this State for the period of three years.

*Respondent suspended.*

Mr. JUSTICE SCHAEFER, dissenting:

Upon a careful consideration of the whole record I am of the opinion that the charges against the respondent have been sustained by clear and convincing proof and that the respondent, a lawyer of considerable experience, knowingly falsified his testimony at the trial in the Federal court and conspired with Skidmore and others for the purpose of

defrauding the United States government of income taxes. In addition, the entire record shows that over a period of years he was intimately associated with Skidmore and Johnson in the establishment and conduct of illegal activities to such an extent as to indicate a wide departure from the standards required of members of the legal profession.

In my opinion, the recommendation of the commissioners should be adopted and the respondent should be disbarred.